## Kennebec Ferry Company *versus* Joseph Bradstreet.

Certain upland was conveyed adjoining easterly upon a river where the tide ebbed and flowed, one of the side lines running at right angles with the river, and the other so as to leave the land towards the river of less extent than at the other end, and the bank of the river at that place being convex,—"together with all the flats and water privileges adjoining to, being at and having the width of the easterly end of the said land, as bounded by the river aforesaid;" the extent and position of the flats are to be determined by drawing a straight line from the south-east and north-east corners of the land at high water mark, and extending lines from the ends of that line and at right angles with it from high to low water mark.

THIS was a writ of entry, brought to recover a piece of land in Gardiner, described as twenty-two feet wide on the street, and extending eastwardly a certain course and distance, and thence on a certain other course to low water mark.

The defendant disclaimed the residue of the demanded premises ; and issue was joined upon the part claimed.

A plan on which are delineated the premises demanded, and the lands adjacent, though not taken for this case, was used at the trial and may be referred to by either party.

It was admitted that Henry Dearborn, under whom both parties derive their titles, was, prior to the 24th December, 1803, the owner of the land demanded, and of the parcel next north, now belonging to the defendant. The plaintiffs intro-

duced a deed from Joshua Wingate and wife, (who was the daughter of said Dearborn,) dated Dec. 31st, 1835, conveying to Arthur Berry a piece of land, twenty-two feet in width on the street, between land that belonged to the late Ebenezer Byram, and land supposed to belong to the heirs of the late Joseph Bradstreet, (admitted to be now the defendant's land,) thence to Kennebec river, together with the flats adjoining the same. Also a deed dated September 22d, 1845, from the said Berry, conveying the same land to the plaintiffs. Also, a deed dated December 24th, 1803, from said Dearborn, by his attorney, conveying to Joseph Bradstreet and Joshua Lord land lying on the river and north of the plaintiffs' lands. The north-east and south-east corners of the upland thus conveyed, were not in controversy, and are marked on the plan A and B. The flats appurtenant are conveyed in that deed in these words :— " together with all the flats and water privileges adjoining to, being at and having the width of the easterly end of the said land as bounded by the river aforesaid. The deeds before mentioned, may be used and referred to by either party.

The north line of the plaintiffs is the south line of the defendant. The counsel for the plaintiffs, contended that the defendant's south line over the flats, would depend upon the true location of their north line, and as there was northerly of the upland conveyed a convex sweep in the river, the north line would be coincident with the south line of the flats appurtenant to the lot above, which would depend upon lines to be accommodated to the sweep of the river. WHITMAN C. J. presiding at the trial, ruled that the southerly line of the Bradstreet purchase, would not be affected by the lines resulting from the convex of the river above. The plaintiffs offered to prove that the straight line between A and B (the north-east and south-east corners of the defendant's upland,) would not correspond with the margin of the flats at ancient high water mark, and that a line drawn at right angles with the ancient high water mark, according to the course of the river between the points nearest to A and B, would exclude the land described.

The Chief Justice ruled, that by the true legal construction of the deed to Bradstreet and Lord, the south line of the flats therein conveyed, must be at right angles with a line drawn straight between the points A and B, whether such line would be in conformity with the ancient high water mark or not.

Whereupon, it appearing by the plan used, that upon this construction of the deed under which the defendant claims, the premises defended would fall to them, the cause by consent was taken from the jury, in order that the legal principles applicable to the facts might be first settled, if the rulings of the Judge were erroneous, or if they were correct and the plaintiffs shall claim the right to show that by an actual location of the lines over the flats, according to said construction, the defendant would not be entitled to the premises defended, or that they had been in possession of any part of the land disclaimed, then a new trial shall be had ; otherwise the plaintiffs to be nonsuit.

No plan or copies of deeds were found in the papers received by the reporter.

*Evans*, for the demandants, argued in support of the positions taken at the trial ; and cited *Adams* v. *Frothingham*, 3 Mass. R. 352 ; *Treat* v. *Strickland*, 23 Maine R. 232 ; *Moore* v. *Griffin*, 22 Maine R. 350 ; *Emerson* v. *Taylor*, 9 Greenl. 42 ; 16 Pick. 441 ; *Valentine* v. *Piper*, 22 Pick. 95.

*H. W. Paine*, for the tenant, argued in support of the ruling of the Judge, at the trial.

*N. Weston*, for the demandants, replied.

The opinion of the Court was drawn up by

TENNEY J. — The lands owned by the parties, lying on the western bank of Kennebec river, consisting of upland and flats adjoining, the north line of the demandants' upland and flats being the south boundary of those of the tenant, were once the property of Henry Dearborn, who conveyed it to the tenant and another person by deed dated in 1803, and that deed was prior to the conveyance to which the demandants trace their title. The line between the tenant's upland

and flats, and the termination of the same at the north-east and south-east corners of his upland are not in controversy; and it appears from the plan, which is admitted to be correct, that it makes with the north line of the tenant's upland an angle less than a right angle and less than it makes with his south line, and is longer than a line which may run in the shortest direction from the south-east corner of his upland to the north line thereof. After the description of the upland in the deed to the tenant, the flats are described as follows, "together with all the flats and water privileges, adjoining to, being at and having the width of the easterly end of said land as bounded by the river aforesaid."

The word end is defined to be the extreme point of a line or any thing that has more length than breadth. Webster's Dic. The end of a parallelogram is the line extending from one side line to the other at their extremities; and the width of the end is the length of such line. If the line connecting the extreme points of parallel side lines, make an angle with one greater than that made with the other, as for instance, one being ten and the other one hundred and seventy degrees, it might not be proper to regard this line the width of the end of the figure presented or even as the end itself. In figures having side lines irregular or not parallel with each other, a line connecting them where they terminate, may be the end, and its length the width of the end, or otherwise according to the peculiar shape of each figure. Hence the words end and width of the end, thus applied, are not terms of great precision, and the meaning of parties who may use them without any words in explanation may not always be apprehended with certainty.

All words used in the description of the premises in a deed, are presumed to be inserted from a belief in the parties, that they are material, and all must be so treated if possible; and nothing is to be considered redundant, if it can be avoided; and when the whole is taken together according to its common and ordinary signification, if it be free from ambiguity, and convey clear and distinct ideas to the mind, and if it can

apply to the subject matter of the conveyance, it is not to be controlled by any thing not found in the deed. In such a case, it is not competent to consider, whether one party or the other, or both conducted with the greatest discretion and wisdom or not; and in giving a construction, the description must stand, although the grantor thereby may have made a division of his land, ruinous to the portion retained by him; or the grantee may have a title to that, which from its location is worthless.

The description of the land in the deed to the tenant, embraces upland " lying on the river," and " all the flats and water privileges, adjoining to, and being at the easterly end of the same." Consequently the eastern boundary of the upland is the western boundary of the flats, and is identical with high water mark. The direction and *termini* of this boundary are agreed by the parties. The eastern boundary of the flats is low water mark, but the place of the extremities thereof on the earth must depend upon the direction of the side lines of the flats. Without the last clause in the description, it might perhaps be doubtful what was intended as the width of the easterly end of the upland, owing to its peculiar form. The flats are to have the width of the easterly end of the upland, and then follows the clause " as bounded by the river aforesaid" without being separated by any mark of punctuation. This clause could not have been intended to indicate the eastern in contra-distinction from the western end of the upland, because the words " easterly end" immediately precede, to, and at which easterly end, the flats are to adjoin and to be; and the flats could not by possibility adjoin the upland at any other place. Without the last clause every thing in the description is clear, and no misapprehension could arise, excepting in reference to " the width of the easterly end" of the upland; and this clause can be applied to no other part with any effect whatever. By rules of grammatical construction, this clause is supposed to be an explanation of the clause immediately preceding, and by regarding it as so intended, it makes that clear, which would otherwise be obscure, as we have already seen. The words " *as* bounded by the river aforesaid," import in what

manner the line is to be run in order to give the length of the line, which should be the measure of the flats. It is clear, that it was intended, that this line should be looked at without reference to any other line of the upland, or the shape of the upland, for the purpose of determining the breadth of the flats; but wholly as its length should be according to the course of the river; and this length was to be the width of the part between high and low water mark.

It follows geometrically, that this width can be had in no other manner than by extending upon the earth the side lines of the flats at right angles with the line of high water, between the north-east and south-east corners of the tenant's upland. Parallel lines drawn in any other direction must necessarily reduce the breadth below that of the length of the measure, which is to be conclusive.

Another question arises under the exceptions, upon the exclusion of certain evidence offered by the demandants. That point was not relied upon at the argument, and when it is examined in connection with the whole case, the ruling was not objectionable.

By the agreement of parties, under this view of the law, a nonsuit must be entered.